**S. AMANDA MARSHALL, OSB # 953473**
United States Attorney
District of Oregon
**NEIL J. EVANS, OSB # 965515**
neil.evans@usdoj.gov
Assistant United States Attorney
United States Attorney's Office
District of Oregon
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2904
Telephone:     (503) 727-1053
Facsimile:      (503) 727-1117

**DANICA ANDERSON GLASER**
danica.glaser@usdoj.gov
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Telephone:     (202) 514-5270
Facsimile:      (202) 616-6583

     of Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. _____ |
| **Plaintiff**, | |
| v. | **COMPLAINT** |
| **THE WESTERN STATES LAND RELIANCE TRUST**, | |
| **Defendant**. | |

Page 1 – COMPLAINT; *United States of America v. Western States Land Reliance Trust*

The United States of America ("United States"), by the authority of the Attorney General of the United States, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), alleges on information and belief as follows:

## STATEMENT OF THE CASE

1.      This is a civil action under Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C. § 9607, for the recovery of response costs that have been incurred by EPA under Section 104 of CERCLA, 42 U.S.C. § 9604, in response to releases and threatened releases of hazardous substances from the Desler/Plywood Mill Asbestos Site (the "Site").  Pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), and 28 U.S.C. § 2201, the United States also seeks a declaratory judgment on Defendant's liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages in connection with the Site.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this matter pursuant to Sections 107 and 113(b) of CERCLA, 42 U.S.C. §§ 9607 and 9613(b), and 28 U.S.C. §§ 1331 and 1345.

3.      Venue is proper in this district pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), and 28 U.S.C. § 1391(b), because the releases and threatened releases of hazardous substances that gave rise to these claims occurred within the District of Oregon and the Site is located in the District of Oregon.

**THE DEFENDANT**

4.  Defendant the Western States Land Reliance Trust (the "Trust") is an Oregon domestic business trust created on July 16, 2002, holding, or formerly holding, real property in trust. Prior to 2002, the Trust was an Arizona charitable trust.

5.  At the time of the events giving rise to this action, the managing trustee of the Trust was Daniel J. Desler ("Desler").

6.  On information and belief, Desler continues to serve as a trustee of the Trust but is no longer the managing trustee. The United States does not know whether any person currently serves as managing trustee of the Trust.

**FACTUAL BACKGROUND**

**A. The Desler/Plywood Mill Asbestos Site**

7.  The Site is located at 2210 Tamarack Street, Sweet Home, Linn County, Oregon. It comprises the southwestern portion of a parcel of land within a former wood production facility (the "Mill Property"). The Site is approximately 2,500 feet west of the South Santiam River and 1,000 feet north of Main Street, the town's main thoroughfare. It is surrounded to the north and northwest by residential homes, the closest of which are approximately 50 feet north of the Site.

8.  Mill buildings were constructed on the Mill Property in 1934 by Powers and Davis. Powers and Davis later became Santiam Lumber Company, and later merged with Willamette Industries, Inc. ("Willamette"). The Site was operated as a plywood mill from 1959 to 1994. After the mills closed, the Site was used by Willamette to store sawdust and equipment.

9.  Prior to 2007, the Site contained several mill buildings, including a sorter/stacker building, two kiln buildings containing dry kilns, and a cooling shed.

10. On December 3, 2001, Willamette transferred the Mill Property, including the Site, to the American Foundation for Charitable Support, Inc. ("AFCS"). AFCS received the Mill Property as a charitable gift with the intention to transfer it to the Trust. The next day, on December 4, 2001, AFCS transferred the Mill Property, including the Site, to the Trust under a bargain and sale deed.

11. The Trust was the owner of the Mill Property and Site until September 2008. At that time, Linn County began foreclosure proceedings against the parcel where the Site is located, as well as other Trust properties, due to delinquent taxes. Linn County involuntarily acquired ownership of the Site due to tax delinquency in September 2010, and is the current owner of the Site.

**B. Asbestos Releases and Cleanup before 2007**

12. The mill buildings on the Mill Property, including the Site, were constructed with asbestos containing materials ("ACM"). Asbestos was present in roofing materials, wallboard and siding, pipe fittings and insulation, and window components of buildings on the Site.

13. Exposure to airborne, friable (easily crumbled or pulverized) asbestos is a potential health risk. Inhaled asbestos fibers may become embedded in lung tissue and, over time, cause serious lung diseases, including asbestosis, lung cancer, or mesothelioma.

14. During the period that Willamette owned the Mill Property, it conducted several asbestos abatement projects to remove some of the asbestos from the mill buildings.

15. In 1995 and 2001, environmental assessments, investigations, and sampling were conducted at the Mill Property. These investigations revealed that asbestos was still present in buildings at the Mill Property, including buildings on the Site.

16. In December 2001, when the Trust acquired the Mill Property, the Trust, Desler, and other parties signed an agreement indemnifying Willamette. The agreement stated that the indemnitors understood hazardous substances might be present at the Mill Property and had received copies of the environmental assessments identifying the "known environmental condition" of the Mill Property.

17. In March 2004, an arson fire on the east end of the Mill Property partially destroyed several buildings. Debris from the fire-damaged buildings was tested and found to contain friable asbestos.

18. After the fire, the Oregon Department of Environmental Quality ("DEQ") sent a letter to the Trust describing the Trust's responsibility, as the property owner, to determine if ACM was present at the Mill Property and to properly abate it, and warning that "open accumulation" of friable ACM was illegal and a health hazard.

19. In April 2004, Desler, on behalf of the Trust, hired Construction and Restoration Specialists ("CRS"), a licensed asbestos abatement contractor, to clean up the area affected by the fire (the "Fire Area").

20. During the cleanup, both DEQ and CRS conducted additional asbestos inspections and sampling at buildings on the Mill Property located outside of the Fire Area. Both DEQ and CRS identified asbestos concerns in buildings outside the Fire Area.

21. DEQ informed the Trust in writing on May 12, 2004, that ACM was present outside the area being cleaned up by CRS and required cleanup immediately.

22. On information and belief, no asbestos abatement occurred on the Site between 2004 and 2007.

### C. The 2007-2008 Demolition

23. In approximately June 2007, Desler, on behalf of the Trust, hired Charles Corp ("Corp"), an independent contractor, to demolish buildings at the Mill Property, including buildings on the Site. Corp was not a licensed asbestos abatement contractor.

24. Desler told Corp before and during the demolition project that all of the asbestos on the Site had been abated.

25. Corp and his crew conducted demolition at the Mill Property from June 2007 to January 2008. The demolition occurred without asbestos surveys or proper asbestos abatement.

26. Much of the demolition debris was dumped on the ground, crushed by equipment, or left in piles on the Site. Some of the wood debris, with roofing material attached, was transported off the Site to a mulching machine elsewhere on the Mill Property. No water was used to suppress dust or wet down the buildings as they were demolished.

27. In approximately January 2008, Desler ordered demolition to stop.

### D. The Initial 2008 Cleanup Efforts

28. On or about February 29, 2008, Desler met with an employee of a demolition and hazard removal company to discuss moving the debris from the demolition off of the Site. The employee noticed suspected ACM in the debris and conducted sampling. On or about March 10, 2008, the employee notified Desler that the samples tested positive for asbestos.

29. On March 29, 2008, Desler, on behalf of the Trust, contacted CRS to arrange for abatement and removal of the demolition debris. CRS and a DEQ employee conducted an assessment at the Site on April 1, 2008. They observed that the sorter/stacker building and the kiln buildings had been partially demolished. They also observed large piles of rubble and demolition debris throughout the Site.

30. DEQ determined that immediate cleanup was appropriate and gave approval for CRS to begin cleanup work that day.

31. During its asbestos abatement work, CRS completed an asbestos survey for the property. The survey revealed that asbestos was present throughout the partially demolished buildings and debris piles on the Site.

32. On or about May 7, 2008, CRS halted its abatement project at the Site because neither CRS nor the landfill that was accepting the ACM waste from the Site had been paid by Desler or the Trust.

33. When the cleanup was put on hold in May 2008, abatement and disposal was still required at the Site.

### E. The 2009 EPA Cleanup

34. In January 2009, DEQ referred the Site to EPA and requested EPA assistance in cleaning up the Site.

35. In April 2009, EPA conducted a site visit. EPA observed rubble piles covering over 66,000 square feet at the former kiln and sorter/stacker buildings. The rubble piles were approximately 50-100 feet from the nearest homes across the street, and friable ACM appeared to be present throughout the rubble. In addition, a portion of the roof of the cooling shed on the Site – containing suspected ACM – had partially collapsed.

36. During a second site visit in June 2009, EPA collected nineteen samples from the Site for asbestos testing. Sixteen of the samples tested positive for elevated asbestos concentrations, some as high as 80 percent.

37. In October 2009, EPA began a time-critical removal action under Section 104 of CERCLA, 42 U.S.C. § 9604, to abate the threat from friable asbestos and ACM on the Site.

38.     EPA conducted a removal action on the Site from October 12 to November 12, 2009.  All of the uncontrolled ACM was removed from the Site.  EPA decontaminated or removed ACM-containing demolition debris, removed asbestos-containing insulation from a partially demolished elevated pipe corridor, and abated ACM roofing material from the collapsed section of the cooling shed roof.  ACM was separated from other debris, properly packaged and labeled, and placed into dumpsters for transport to an EPA-approved landfill.

39.     In total, EPA cleaned up approximately 70,000 square feet at the Site and removed 4,806,720 pounds of ACM before demobilizing on November 12, 2009.

40.     As of July 31, 2012, EPA's response action at the Site has incurred costs totaling $1,589,752.52.

## LAW GOVERNING CLAIM FOR RELIEF

41.     Section 104(a)(1) of CERCLA, 42 U.S.C. § 9604(a)(1), provides in pertinent part:

> Whenever any hazardous substance is released or there is a substantial threat of such a release into the environment . . . the President is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance . . . at any time (including its removal from any contaminated natural resource), or take any other response measure consistent with the national contingency plan which the President deems necessary to protect the public health or welfare or the environment.

42.     Section 104(b)(1) of CERCLA, 42 U.S.C. § 9604(b), provides in pertinent part:

> Whenever the President is authorized to act pursuant to subsection (a) of this section [i.e. 42 U.S.C. § 9604(a)] . . . he may undertake such investigations, monitoring, surveys, testing, and other information gathering as he may deem necessary or appropriate to identify the existence and extent of the release or threat thereof, the source and nature of the hazardous substances . . . involved, and the extent of danger to the public health or welfare or to the environment.  In addition, the President may undertake such planning, legal, fiscal, economic, engineering, architectural, and other studies or investigations as he may deem necessary or appropriate to plan and direct response actions, to recover the costs thereof, and to enforce the provisions of this chapter.

43. The President has delegated his authority under Sections 104(a) and (b) of CERCLA, 42 U.S.C. §§ 9604(a) and (b), to the Administrator of the EPA to arrange for the cleanup of hazardous substances or to conduct investigations and studies as necessary to determine the need for, and extent of, such a cleanup.

44. Section 107(a) of CERCLA, U.S.C. § 9607(a), provides in pertinent part:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section [i.e. 42 U.S.C. § 9607(b)] –

    (1) the owner and operator of a . . . facility,

    (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

    (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, . . . at any facility . . . owned or operated by another party or entity and containing such hazardous substances, and

    (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for–

        (A) all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the national contingency plan . . . .

45. The national contingency plan ("NCP") provides the "procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants . . . ." 42 U.S.C. § 9605(a). The NCP is codified at 40 C.F.R. Part 300.

46. Section 107(a) of CERCLA, 42 U.S.C. § 9607, also provides that "the amounts recoverable in an action under this Section shall include interest on the amounts recoverable under subparagraphs (A) through (D)."

47. Liability under Section 107(a) of CERCLA, 42 U.S.C. § 9607, is strict and joint and several.

48. Section 113(g)(2)(B) of CERCLA, 42 U.S.C. § 9613(g)(2), entitles the United States to obtain a declaratory judgment on liability for future response costs: "[T]he court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."

## CLAIM FOR RELIEF

49. The Site is a "facility" as defined in Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), and as used in Section 107 of CERCLA, 42 U.S.C. § 9607.

50. Asbestos is a "hazardous substance" within the meaning of Sections 101(14) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(13), 9607(a).

51. There have been "releases" and "threatened releases" of asbestos at and from the Site within the meaning of Sections 101(22) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(22), 9607(a).

52. "Disposal" of hazardous substances, namely asbestos, occurred at the Site within the meaning of Sections 101(29) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(29), 9607(a).

53. Defendant the Western States Land Reliance Trust is a "person" within the meaning of Sections 101(21) and 107 of CERCLA, 42 U.S.C. §§ 9601(21), 9607.

54. The Western States Land Reliance Trust was an "owner" of the Site, within the meaning of Sections 101(20) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(20), 9607(a), when hazardous substances were disposed of at the Site.

55. As a result of the releases or threatened releases of hazardous substances from the Site, the United States has undertaken response actions not inconsistent with the National Oil and

Hazardous Substances Pollution Contingency Plan, 40 C.F.R. Part 300, and has incurred response costs, including the costs of a removal action, as defined in Sections 101(23), (24) and (25) of CERCLA, 42 U.S.C. § 9601(23), (24) and (25), and as used in Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

56.     The Defendant is liable to the United States for all costs of response actions incurred by the United States relating to the Site, including enforcement costs and pre-judgment interest on all such costs, pursuant to Sections 107(a) and 113(g)(2) of CERCLA, 42 U.S.C. §§ 9607(a), 9613(g)(2).

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests that this Court:

A.     Enter judgment, pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), in favor of the United States and against the Defendant for all response costs incurred by the United States in relation to the Site;

B.     Enter a declaratory judgment, pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), that will be binding on any subsequent action or actions to recover further response costs or damages, declaring the Defendant liable for future response costs incurred by the United States in relation to the Site;

C.     Award the United States its costs of this Action; and

D.     Award the United States such other and further relief as the Court deems just and proper.

Respectfully submitted,

**S. AMANDA MARSHALL**
United States Attorney
District of Oregon OSB # 953473

**NEIL J. EVANS**
Assistant United States Attorney
U.S. Attorney's Office
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2904
Oregon State Bar No. 965515
Tel.: (503) 727-1053
Fax: (503) 727- 1117
neil.evans@usdoj.gov

**ELLEN M. MAHAN**
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice

/s/ *Danica Anderson Glaser*
**DANICA ANDERSON GLASER**
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
Tel.: (202) 514-5270
Fax: (202) 616-6583
danica.glaser@usdoj.gov

Of Attorneys for Plaintiff United States

Of Counsel:
WENDY M. WATSON
Attorney-Adviser
Office of Regional Counsel
U.S. Environmental Protection Agency, Region 10
1200 Sixth Avenue
Suite 900, ORC-158
Seattle, WA 98101
Telephone: (206) 553-8337
Email: watson.wendy@epa.gov